**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LORRAINE CULL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.: 4:18-cv-04289** |
| **MEMORIAL HERMANN** | § | |
| **HEALTH SYSTEM,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dated January 21, 2020

Of Counsel:

Luke C. MacDowall
Texas Bar No. 24104445
Federal I.D. No. 2983511
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas  77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
Email:  lmacdowall@littler.com

Respectfully submitted,

*/s/ Nehal S. Anand*
Nehal S. Anand (Attorney in Charge)
Texas Bar No. 24070600
Federal I.D. No. 1061200
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas
Telephone:  713.951.9400
Facsimile:  713.951.9212
Email:  nanand@littler.com

**ATTORNEYS FOR DEFENDANT**
**MEMORIAL HERMANN HEALTH**
**SYSTEM**

## TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDING ....................................................................1

II.     ISSUES TO BE RULED ON BY THE COURT ............................................................1

III.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................1

IV.     STATEMENT OF FACTS .............................................................................................3

        A.      In May 2015, Cull's Manager Recruited Her for a Newly Created
                Role as a Senior CQI Specialist Within the Department. .......................................3

        B.      In 2016, Cull and Her Manager Recruited an Employee From the
                Information Services Department, Pamela Mahan-Rudolph, to
                Meet the Growing Technical Needs of the Team. ....................................................5

        C.      In the Spring of 2017, Cull Expressed Dissatisfaction With the
                Changing Focus of Her Work on the Team and Applied for Other
                Jobs. ........................................................................................................................8

        D.      As a Result of a Mandate From His Superiors, Dr. Kunisch Had to
                Eliminate One of the Senior SQI Specialist Positions for a July 7,
                2017, Reduction-in-Force, and He Selected Cull's Position for
                Elimination Based on Factors Completely Unrelated to Her Age. ..........................9

V.      ARGUMENT AND AUTHORITY ...............................................................................11

        A.      Memorial Hermann is Entitled to Summary Judgment on Cull's
                Age Discrimination Claim. ....................................................................................11

                1.      There is no evidence that Cull was qualified to assume any
                        open position within Memorial Hermann at the time of her
                        discharge in July 2017. .............................................................................12

                2.      There is no evidence from which a factfinder might
                        reasonably conclude that Cull was terminated because of
                        her age. .....................................................................................................13

                3.      Memorial Hermann had a legitimate, non-discriminatory
                        reason for selecting Cull for the reduction-in-force, and
                        there is no evidence that this reason was merely a pretext
                        for age discrimination. ..............................................................................14

        B.      Memorial Hermann is Entitled to Summary Judgment on Cull's
                FMLA Retaliation Claim. ......................................................................................21

VI.     CONCLUSION ...........................................................................................................23

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Agoh v. Hyatt Corp.*,
    922 F. Supp. 2d 722 (S.D. Tex. 2014) ...................................................................20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...........................................................................................11

*Barber v. Shaw Grp., Inc*
    243 F. App'x 810 (5th Cir. 2007) ..................................................................18

*Brown v. CSC Logic, Inc.*,
    82 F.3d 651 (5th Cir. 1996) ......................................................................17, 20

*Chavarria v. Despachos Del Notre, Inc.*,
    390 F. Supp. 2d 591 (S.D. Tex. 2005) ...........................................................13

*Creaghe v. Albemarle Corp.*,
    98 F. App'x 972 (2004) ..................................................................................12

*Daniel v. Universal Ensco, Inc.*,
    507 F. App'x 434 (5th Cir. 2013) .................................................................16

*E.E.O.C. v. Tex. Instruments Inc.*,
    100 F.3d 1173 (5th Cir. 1996) ................................................................15, 17

*Eugene v. Rumsfeld*,
    168 F. Supp. 2d 655 (S.D. Tex. 2001) ...........................................................14

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986) .......................................................................11

*Glick v. Greatwide Logistics Services, LLC*,
    2013 WL 2355398 (N.D. Tex. May 29, 2013) ...............................................13

*Gollas v. U. of Tex. Health Sci. Ctr. at Houston*,
    425 F. App'x 318 (5th Cir. 2011) .................................................................14

*Hanchey v. Energas Co.*,
    925 F.2d 96 (5th Cir. 1990) ...........................................................................11

*Hess v. Mid Hudson Valley StaffCo LLC*,
    2018 WL 4168976 (S.D.N.Y. Aug. 30, 2018).................................................17

*Holloway v. ITT Educ. Services, Inc.*,
    2014 WL 4273896 (S.D. Tex. Aug. 28, 2014) ...............................................16

*Jarvis v. Cirrus Logic, Inc.*,
    2003 WL 22024271 (W.D. Tex. Jul. 15, 2003) ..............................................16

*Little v. Republic Ref. Co.*,
    924 F.2d 93 (5th Cir. 1991) ...........................................................................14

*Machinchick v. PB Power, Inc.*,
    398 F.3d 345 (5th Cir. 2005) ...............................................................11, 12

*Matthews v. United Bhd. of Carpenters & Joiners of Am.*,
    228 F. App'x 436 (5th Cir. 2007) ................................................................18

*Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*,
    446 F.3d 574 (5th Cir. 2006) .......................................................................21

*McCullough v. Houston Cnty. Tex.*,
    297 F. App'x 282 (5th Cir. 2008) ................................................................21

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
    934 F.3d 447 (5th Cir. 2019) .......................................................................11

*Nomani v. Star Furniture Co.*,
    2016 WL 4192057 (S.D. Tex. Aug. 8, 2016) ...............................................20

*Pegram v. Honeywell, Inc.*,
    361 F.3d 272 (5th Cir. 2004) ..................................................................19, 22

*Penalver v. Resource Corp. of Am.*,
    2011 WL 1885988 (N.D. Tex. May 18, 2011) .............................................20

*Reed v. Neopost USA, Inc.*,
    701 F.3d 434 (5th Cir. 2012) .......................................................................12

*Resolution Trust Corp. v. Starkey*,
    41 F.3d 1018 (5th Cir. 1995) .......................................................................19

*Roberson v. Alltel Info. Servs.*,
    373 F.3d 647 (5th Cir. 2004) .......................................................................15

*Samford v. Stolle Corp.*,
    181 F.3d 96, 1999 WL 346958 (5th Cir. 1999) (unpublished) ...................16

*Strong v. Univ. Health Care Sys.*,
    482 F.3d 802 (5th Cir. 2007) .......................................................................21

*Sullivan v. Worley Catastrophe Servs., LLC*,
    591 F. App'x 243 (5th Cir. 2014) ................................................................12

*Tyler v. La-Z-Boy Corp.*,
    506 F. App'x 265 (5th Cir. 2013) ................................................................13

*Wallace v. Methodist Hosp. Sys.*,
    271 F.3d 212 (5th Cir. 2001) .......................................................................19

**Statutes**

29 U.S.C. § 623(a)(1)....................................................................................11

Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ..................... *passim*

Family Medical Leave Act, 28 U.S.C. § 2601, *et seq.*......................................... *passim*

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Memorial Hermann Health System ("Memorial Hermann") files this Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

## I.
## <u>NATURE AND STAGE OF PROCEEDING</u>

This is an employment discrimination case in which the plaintiff, Lorraine Cull, alleges that her former employer, Memorial Hermann, discriminated against her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), and that it retaliated against her in violation of the Family and Medical Leave Act ("FMLA"), when it terminated her employment as part of a reduction-in-force in July 2017.

Discovery closed in this case on October 11, 2019. *See* Dkt. No. 11. The dispositive motions deadline is January 21, 2020, and trial is currently scheduled for April 20, 2020. Memorial Hermann now moves for complete summary judgment.

## II.
## <u>ISSUES TO BE RULED ON BY THE COURT</u>

1.    Is Memorial Hermann entitled to summary judgment on Cull's ADEA discrimination claim when there is no evidence that Cull was selected for the reduction-in-force because of her age?

2.    Is Memorial Hermann entitled to summary judgment on Cull's FMLA retaliation claim when there is no evidence that she was selected for the reduction-in-force because she took FMLA leave?

## III.
## <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

Cull was employed by Memorial Hermann in various positions for approximately 11 years before being laid off during a reduction-in-force on July 7, 2017.[1] Cull's manager selected her for the lay-off, instead of another employee in the same position, because (1) Cull had a lower

---

[1] Memorial Hermann is a non-profit healthcare system with various facilities in Southeast Texas.

performance evaluation rating, (2) the other employee had a unique skill set that was valuable to the department, and (3) Cull had previously told her manager that she was dissatisfied with her position and was applying for other jobs.

Although Cull admitted in her deposition that she had no knowledge of who made the decision to terminate her employment, Cull speculates that her lay-off must have had something to do with her age and her FMLA leave. Further highlighting the frivolous nature of Cull's age discrimination claim, the manager who selected Cull for the reduction-in-force is the same manager who recruited and then hired her for her position in his department approximately two years earlier, and both her manager and the other employee who was not terminated are in the same age-protected class as Cull. As explained below, Cull cannot state a *prima facie* case of age discrimination because she can present no evidence that she was qualified for a vacant position at the time of the elimination of her position, or otherwise terminated because of her age. Moreover, other than her speculative beliefs and two "stray remarks," Cull has no evidence that Memorial Hermann terminated her for pretextual reasons.

Cull also implausibly claims that she was terminated in retaliation for taking intermittent FMLA leave. Cull admits that other than the fact that she was still approved for intermittent leave at the time of her termination, and her speculative belief that another employee (who reported to a different manager) was also laid off after taking FMLA leave, she has no evidence to support her FMLA retaliation claim. As such, Cull cannot make a *prima facie* case of retaliation because there is no evidence she was treated less favorably than a valid comparator, and there is no evidence of a causal connection between her leave and the manager's decision to select her for the reduction-in-force. Finally, Cull also lacks any competent evidence to prove that the legitimate reason for her termination in the reduction-in-force was pretext to unlawfully retaliate against her.

For these reasons, Memorial Hermann is entitled to complete summary judgment because Cull cannot establish a genuine issue of material fact on any of her claims.

# IV.
## STATEMENT OF FACTS

**A.    In May 2015, Cull's manager recruited her for a newly created role as a Senior CQI Specialist within the Department.**

Memorial Hermann employed Cull from 2006 until her termination in a reduction-in-force on July 7, 2017. (Cull Dep. 76:14-19). Over this span, Cull worked in several different positions where she focused on educating staff on quality assurance efforts.[2] From approximately August 2013 until September 2015, Cull worked as a Senior Patient Safety Specialist within Memorial Hermann's Quality and Patient Safety and Infection Control Department ("QPSIC"), which has oversight of quality performance of the work carried out within the Health System. (Cull Dep. 84:23-88:1; Mickan Dep. 15:19-16:4).[3]

In late 2013 or early 2014, Dr. Joseph Kunisch, Enterprise Director of Clinical Quality Information – Regulatory Performance in QPSIC, began to oversee a newly created eQuality

---

[2] By way of a summary, from 2006 until March 2008, Cull worked as a Performance Improvement Coordinator where she reviewed quality metrics regarding the Health System's handling of certain ailments. (Cull Dep. 76:23-25, 77:17-79:5). From March 2008 until approximately December 2012, Cull worked as a Clinical Informaticist, helping to train and audit clinicians' use of electronic medical records. (Cull Dep. 79:6-81:11). Finally, from approximately December 2012 until approximately August 2013, Cull worked as a Patient Resource Educator, training patient safety specialists, assisting with research projects, and giving presentations to clinicians. (Cull Dep. 81:12-84:13).

[3] The QPSIC Department was headed by Memorial Hermann's Chief Quality Officer, Dr. Angela Shippy, during Cull's employment. (Kunisch Dep. 8:6-13). Dr. Shippy supervised three Associate Vice Presidents: Georgia Thomas, Shannon Lutz, and Maria Roth. (Kunisch Dep. 8:18-23, 44:8-11). These three Associate Vice Presidents supervised Directors of the various teams within QPSIC, including Dr. Joseph Kunisch, who made the termination decision at issue here. (Kunisch Dep. 8:18-23).

Check Team ("Team") (Ex. 24, Kunisch Decl., ¶3; Kunisch Dep. 9:16-21, 13:14-15:9).[4] Kunisch hired Michael Mickan to manage the Team by supervising four team members who were employed as Clinical Quality Informatics Specialists ("CQI Specialists"). (Ex. 24 at ¶3; Mickan Dep. 8:10-9:1, 11:12-12:10; Cull Dep. 104:16-22).[5]

The need for the Team arose out of electronic reporting requirements created by the Affordable Care Act. (Ex. 24 at ¶3; Mickan Dep. 33:4-17). Specifically, it was responsible for reporting electronic quality measure data to an electronic health record vendor called CERNER, by extracting the data from electronic health records, compiling the data into different files for transmission, making sure the data was accurately reported, and if not, identifying the source of any discrepancies. (Ex. 24 at ¶3; Kunisch Dep. 9:22-10:9; Mickan Dep. 33:4-34:23).

In or about May 2015, Dr. Kunisch approached Cull about joining the Team. (Ex. 24 at ¶4; Cull Dep. 88:5-18, 89:8-90:2). Cull was interested, but because the CQI Specialist position would have required that she take a pay cut, they discussed creating a senior level position with higher pay that would be responsible for management-level work. (Ex. 24 at ¶4; Kunisch Dep. 41; Cull Dep. 88:5-18, 89:8-90:2, 91:15-24). Cull agreed to accept the new position, and between May and September 2015, she worked in a "transitional" capacity between her Senior Patient Safety Specialist position and the Senior Clinical Quality Informatics Specialist ("Senior CQI Specialist") position while waiting for Memorial Hermann's human resources department to approve the new job description. (Ex. 24 at ¶4; Kunisch Dep. 18:23-19:6; Cull Dep. 84:19-88:1, 88:5-18, 89:8-90:2,

---

[4] Dr. Kunisch began his employment with Memorial Hermann in January 2012 as Director of Clinical Quality Review. (Ex. 24 at ¶2; Kunisch Dep. 13:15-18). In this role, Kunisch oversaw a team of employees called Clinical Quality Reviewers who manually abstracted data from medical charts to analyze for quality assurance purposes and entered the data into a software system, which compiled the information for transmission to the Centers for Medicare/Medicaid Services ("CMS"). (Ex. 24 at ¶2; Kunisch Dep. 9:16-10:9). In late 2013 or early 2014, Dr. Kunisch's role changed as he became the Enterprise Director of Clinical Quality Information – Regulatory Performance. (Ex. 24 at ¶3; Kunisch Dep. 13:14-15:1).

[5] "Informatics" is a very broad category which describes the science of using information. (Cull Dep. 74:2-11).

4

97:13-17). After it was approved, Cull executed the new job description on September 28, 2015, which is when she officially began working in the Senior CQI Specialist position fulltime. (Ex. 24 at ¶4; Cull Dep. 111:19-112:10; Ex. 4).

**B.     In 2016, Cull and her manager recruited an employee from the Information Services Department, Pamela Mahan-Rudolph, to meet the growing technical needs of the Team.**

When Cull joined the Team in 2015, management was in the process of rethinking its mission. (Ex. 24 at ¶5; Mickan Dep. 18:16-20). At its inception, the Team had been developed to interact with, to study, to analyze, and to quality check different software applications being uploaded to the electronic health records for purpose of capturing and then communicating electronic clinical quality measure data. (Ex. 24 at ¶5; Mickan Dep. 18:16-20:25). Employees in the CQI Specialist position were supposed to carry out these tasks. (Ex. 24 at ¶5). However, the Team had also originally been tasked with educating physicians and nurses across the hospital system on the use of electronically stored data. (Ex. 24 at ¶5; Mickan Dep. 18:16-20:25). Cull was asked to join the Team because of her background in research, compiling electronic health record information, and putting together project plans and presentations, which Dr. Kunisch and Mickan thought would be helpful for this purpose. (Ex. 24 at ¶5; Mickan Dep. 18:16-20:25). It was in this regard that the Senior CQI Specialist role was intended to be more independent, more research and development oriented, and involved in greater project management compared with the regular CQI Specialist role. (Ex. 24 at ¶5; Mickan Dep. 18:16-20:25).

The focus of the Team changed extensively, however, since its inception. (Ex. 24 at ¶6; Kunisch Dep. 38:6-15). For example, there were dramatic changes in the information that CERNER required to be captured and reported to CMS during this period of time. (Ex. 24 at ¶6; Kunisch Dep. 38:25-39:8; Mickan Dep. 19:2-14). As a result, management started rethinking what work would be done on an ongoing basis, and the Team's focus shifted from the clinician-facing

education role that they originally had in mind for the Senior CQI Specialist toward the back-end, computer-related work that was more technical in nature. (Ex. 24 at ¶6; Kunisch Dep. 39:9-24; Mickan Dep. 19:15-20:7). In particular, the opportunities to work on educational projects were becoming less frequent. (Ex. 24 at ¶6; Mickan Dep. 25:24-27:12).

As time progressed, management also realized that the Team needed to depend heavily on the Information Services Department ("ISD") because ISD controlled both the hardware and software across Memorial Hermann. This created problems when dealing with ISD's competing priorities across the Health System because the Team often had to wait for ISD to upload software for testing. (Ex. 24 at ¶7; Mickan Dep. 20:8-20). Consequently, Kunisch and Mickan wanted to identify someone who could "bridge the gap" between the Team's needs and ISD's capabilities to make this process smoother. (Ex. 24 at ¶7; Mickan Dep. 20:8-20). The person Kunisch and Mickan identified was Pamela Mahan-Rudolph who was working in Memorial Hermann's ISD at the time. (Ex. 24 at ¶7; Mickan Dep. 20:8-20).

Dr. Kunisch felt that Mahan-Rudolph was someone who could take on project management with her unique skill set that the nurses who were already on the team, including Cull, did not have. (Ex. 24 at ¶7; Kunisch Dep. 43:9-15). Parroting this sentiment, Mickan felt that Mahan-Rudolph's particular skills, abilities, and background were very valuable to the team because of the changes that they were facing. (Mickan Dep. 20:8-20). During this process, Cull likewise agreed that Mahan-Rudolph would be a good addition, and in fact, Cull recruited Mahan-Rudolph for the position from ISD. (Cull Dep. 131:18-132:16, 133:2-134:21; Kunisch Dep. 25:13-17; Mickan Dep. 18:4-15).

As part of this recruitment effort, Dr. Kunisch and Mickan realized that they had been unnecessarily restrictive in their view of the types of individuals who could contribute to the Team.

(Ex. 24 at ¶8; Mickan 47:15-23). While a Bachelor's of Science in Nursing was originally required for both the CQI Specialist and the Senior CQI Specialist positions, they decided to change the job description to more accurately reflect the needs of the Team by expanding the list of degrees that would qualify a candidate for the positions by including other healthcare-related degrees. (Ex. 24 at ¶8; Mickan 47:24-48:9).[6] This updated job description was submitted to human resources, and approved on or about February 23, 2016. (Ex. 24 at ¶8; Ex. 5).

In the meantime, Mahan-Rudolph began working on the Team in approximately December 2015. (Ex. 24 at ¶9; Cull Dep. 131:22-24; Mickan Dep. 11:8-11). Though initially hired into the regular CQI Specialist position, and while she performed work alongside the CQI Specialists for a brief period of time to become acquainted with the Team's activities, Mahan-Rudolph quickly took on a greater degree of responsibility and project management, beyond what was expected of the position. (Ex. 24 at ¶9; Mickan Dep. 21:1-15, 64:16-65:14). This led to her promotion to the Senior CQI Specialist position in the fall of 2016. (Ex. 24 at ¶9; Mickan Dep. 21:13-19, 58:21-25).

While Cull and Mahan-Rudolph shared the same job title, they did not perform the same job duties while on the Team. Cull focused on the clinician-facing work while Mahan-Rudolph focused on identifying issues that needed to be addressed on the back-end by ISD – the Department from which Mahan-Rudolph had been recruited. (Ex. 24 at ¶10; Cull Dep. 141:6-144:22). Cull was not doing the same type of interfacing work with ISD that Mahan-Rudolph was doing. (Ex. 24 at ¶10; Mickan Dep. 24:23-26:14). For example, while Cull gave patient safety initiatives and performed work related to clinician educational opportunities (work Mahan-Rudolph did not

---

[6] A nursing degree was originally required because Kunisch and Mickan thought that the pool of candidates from which they would be hiring would have nursing-related experience. (Ex. 24 at ¶8; Mickan Dep. 47:24-48:9).

7

perform), Mahan-Rudolph worked on coding-related work to connect the Team with ISD (work Cull did not perform). (Ex. 24 at ¶10; Mickan Dep. 24:23-26:14; Cull Dep. 146:6-148:24). In fact, Cull mentioned to both Dr. Kunisch and Mickan that she was uninterested in pursing the type of work that Mahan-Rudolph performed. (Ex. 24 at ¶10; Mickan Dep. 25:24-26:14).

**C.  In the spring of 2017, Cull expressed dissatisfaction with the changing focus of her work on the Team and applied for other jobs.**

In January 2017, Mickan resigned his position with Memorial Hermann to pursue a different career. (Ex. 24 at ¶11; Cull Dep. 104:16-105:5; Mickan Dep. 6:21-7:11, 37:20-38:4). Around this same time, Cull informed Dr. Kunisch that she was unhappy with the work she was being asked to perform, and that she intended to apply for other jobs. (Ex. 24 at ¶11; Kunisch Dep. 55:11-56:15). Kunisch said that he understood, and asked her to let him know if there was anything he could do to support her in looking for other work. (Ex. 24 at ¶11; Kunisch Dep. 55:11-56:15).

In the meantime, Cull applied for intermittent FMLA leave to care for her son in March 2017, and this request was fully approved by Memorial Hermann. (Cull Dep. 180:15-183:8). Then, in the spring of 2017, Cull began applying for other jobs. She applied for two nursing positions within Memorial Hermann on May 31, 2017, and she informed Dr. Kunisch that she had applied to these jobs. (Ex. 24 at ¶11; Cull Dep. 189:20-190:12; Ex. 18 [MHHS 000613-615]; Ex. 19 [MHHS 000616-618). Cull was not hired for either position. (Cull Dep. 189:20-191:8). Dr. Kunisch was not a decision-maker with respect hiring for these positions, as both were in different facilities within the Health System. (Ex. 24 at ¶11).

**D.      As a result of a mandate from his superiors, Dr. Kunisch had to eliminate one of the Senior SQI Specialist positions for a July 7, 2017, reduction-in-force, and he selected Cull's position for elimination based on factors completely unrelated to her age.**

In approximately February 2017, the directors in QPSIC, including Dr. Kunisch, were notified that they would need to make selections for an upcoming reduction-in-force after undertaking a review to determine if the needs of the Department could be met with fewer employees. (Kunisch Dep. 43:16-44:17). Dr. Kunisch was very disappointed in having to comply with this mandate because he did not want to eliminate any positions at all. (Ex. 24 at ¶12; Kunisch Dep. 51:13-19). However, as a result of his analysis, Dr. Kunisch determined that the nature of the work required keeping only one of the two Senior CQI Specialists on the Team. (Ex. 24 at ¶12; Kunisch Dep. 49:14-52:3; Ex. 20 [MHHS 000694-695], Ex. 21 [MHHS 000698]). Dr. Kunisch then had to make the unenviable decision of selecting either Cull or Mahan-Rudolph for the reduction-in-force. (Ex. 24 at ¶12; Kunisch Dep. 51:22-52:3).

To make his decision, Dr. Kunisch considered the following factors:  (1) their respective 2016 performance review ratings; (2) their respective skills relative to the direction of the Team's work, which had changed since originally creating the Team; and (3) Cull's previously expressed dissatisfaction with the work of the Team and plan to search for other positions. (Ex. 24 at ¶13; Kunisch Dep. 52:17-21, 55:7-20). With respect to the first factor, Cull had a lower performance rating than Mahan-Rudolph since Mickan had assigned Cull a rating of "Exceeds Expectations" but had assigned Mahan-Rudolph a rating of "Outstanding" – the highest rating possible. (Ex. 24

at ¶13; Mickan Dep. 66:5-13; Ex. 10 [MHHS 000171-185]; Ex. 22 [MHHS 000639-644]).[7] With respect to the second factor, Dr. Kunisch believed that Mahan-Rudolph was more integral to the Team's future work because the Team was not doing as much of the clinician-facing work that Cull typically performed, and instead was doing more of the technical back-end work that Mahan-Rudolph performed. (Ex. 24 at ¶13; Kunisch Dep. 55:7-20).[8] Finally, with respect to the third factor, Dr. Kunisch thought that Cull would be less impacted by the decision to eliminate her position since she had already expressed dissatisfaction with the Team's work, and had actually been applying for other jobs. (Ex. 24 at ¶13; Kunisch Dep. 55:7-20). Dr. Kunisch informed the Associate Vice President to whom he reported, Georgia Thomas, of his selection, and this decision was approved. (Ex. 24 at ¶13; Kunisch Dep. 22:5-23:15; Ex. 23 [MHHS 000701-702]).

On June 26, 2017, Dr. Kunisch and a human resources representative met with Cull to inform her that her position would be eliminated effective July 7, 2017. (Ex. 24 at ¶16; Cull Dep. 204:21-205:5, 205:23-206:17). Cull was provided with contact information for Memorial Hermann's Talent Acquisition Department, which she could contact for assistance in applying for other positions within the Health System, but Cull never contacted this group. (Cull Dep. 207:16-25, 214:5-19).

---

[7] Annual performance reviews were done at the end of the fiscal year, which ran from July 1 through June 30. (Mickan Dep. 13:25-14:17). Typically, however, the reviews would not be finalized until August or September. (Mickan Dep. 13:25-14:17). At the time of the 2016 reviews, Mahan-Rudolph was still in the CQI Specialist position, but Mickan recommended her for promotion to the Senior CQI Specialist position in her review because she had been performing work of the Senior-level position. (Mickan Dep. 58:15-25). In fact, Mickan would have given her an "outstanding" rating even if she were in the Senior-level position at the time. (Mickan Dep. 60:4-13). As noted above, Mahan-Rudolph was ultimately promoted to the Senior-level position in the fall of 2016.

[8] Because of the changing direction of the eQuality Check Team, Mickan agreed that Mahan-Rudolph was more integral to the team moving forward than Cull. (Mickan Dep. 67:11-17).

# V.
## ARGUMENT AND AUTHORITY

In order to prevail on its Motion for Summary Judgment, the movant must demonstrate that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant meets its burden, the non-movant must demonstrate by substantial evidence that there is an "outcome determinative" issue of fact in dispute. *See Hanchey v. Energas Co.*, 925 F.2d 96, 97 (5th Cir. 1990) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195-96 (5th Cir. 1986)). Even if an alleged factual dispute is asserted, the dispute will not defeat the motion unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**A.    Memorial Hermann is entitled to summary judgment on Cull's age discrimination claim.**

The ADEA prohibits an employer from discharging an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). In a reduction-in-force case, such as this one, the plaintiff must prove four elements to state a *prima facie* case:  "(1) that [s]he is within the protected age group; (2) that [s]he has been adversely affected by the employer's decision; (3) that [s]he was qualified to assume another position at the time of the discharge; and (4) 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'" *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456 n.4 (5th Cir. 2019).

The burden of production then shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment action. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). The defendant may meet this burden by presenting evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.* If the defendant meets its burden, the plaintiff must meet its ultimate

burden of persuasion on the issue of intentional discrimination. *Id.* Importantly, the plaintiff cannot show intentional discrimination under the ADEA merely by showing that age was a "motivating factor" for adverse action; instead, the plaintiff must prove that age was the "but-for" cause of the adverse action. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012).

For purposes of this Motion, Memorial Hermann does not contest that Cull can establish the first two elements of the *prima facie* case because Cull was within the protected age group and adversely affected by Memorial Hermann's reduction-in-force decision. Nevertheless, Cull cannot state a *prima facie* case because she cannot show that she was qualified to assume another position at the time of her discharge, and also cannot point to evidence from which a factfinder might reasonably conclude that Memorial Hermann intended to discriminate. Moreover, even if she could, Memorial Hermann still would be entitled to summary judgment because the reduction-in-force was a legitimate, non-discriminatory reason for terminating Cull's employment, and there is no evidence that Memorial Hermann selected Cull as a pretext for age discrimination.

1. <u>There is no evidence that Cull was qualified to assume any open position within Memorial Hermann at the time of her discharge in July 2017.</u>

In order to satisfy the third element of the *prima facie* case, the plaintiff has to show that she was qualified for an open position with the defendant at the time of discharge. *See Creaghe v. Albemarle Corp.*, 98 F. App'x 972, 975 (2004). In *Creaghe*, the plaintiff was terminated in a reduction-in-force at the age of 72 after working for the defendant-employer for nearly 30 years. *Id.* at 972-73. The plaintiff filed an ADEA lawsuit, alleging that he had been selected for termination on account of his age, but the Fifth Circuit held that the plaintiff failed to present a *prima facie* case of discrimination because he "identified no alternative position for which he was qualified when he was fired." *Id.* at 975; *see also Sullivan v. Worley Catastrophe Servs., LLC*, 591 F. App'x 243, 246 n.3 (5th Cir. 2014) (affirming summary judgment in favor of the defendant

where the plaintiff failed to raise an issue of material fact regarding pretext, but noting that the defendant's alternative argument "ha[d] force," which was that the plaintiff could not establish a *prima facie* case where he "did not allege – and ha[d] no evidence – that there were other positions available that he was qualified to assume at the time of his discharge"); *Tyler v. La-Z-Boy Corp.*, 506 F. App'x 265, 269 (5th Cir. 2013); *Chavarria v. Despachos Del Notre, Inc.*, 390 F. Supp. 2d 591, 597 (S.D. Tex. 2005) (holding that the plaintiffs failed to establish a *prima facie* case where uncontroverted evidence showed that "no other positions were available for the[] Plaintiffs" at the time of the reduction-in-force); *Glick v. Greatwide Logistics Services, LLC*, No. 3:12–CV–246–L, 2013 WL 2355398, at *8 (N.D. Tex. May 29, 2013) (holding that the plaintiff had failed to make a *prima facie* showing that there were any "vacant positions" for which she was qualified at the time of her termination).

Here, Cull cannot show that she was qualified for any open position with Memorial Hermann at the time of the reduction-in-force in July 2017. In fact, there is no evidence in the record that there were any vacancies at all – let alone vacancies for which she was qualified. During the June 26, 2017, meeting where Cull was informed that her position was being eliminated, Cull was provided with contact information for Memorial Hermann's Talent Acquisition group, which assists in placing individuals in other positions within the Health System, yet she never called to inquire about or apply for any open positions. (Cull Dep. 214:5-19). Therefore, Cull has failed to satisfy her *prima facie* burden, and her ADEA claim should be dismissed.

2.    There is no evidence from which a factfinder might reasonably conclude that Cull was terminated because of her age.

Cull also cannot state a *prima facie* case because she can point to no evidence from which a factfinder might reasonably conclude that Memorial Hermann intended to discriminate against her based on her age. Cull admitted in her deposition that she had no knowledge of who made the

13

decision to terminate her employment, or the factors that the decision-maker relied upon in eliminating her position. (Cull Dep. 193:25-194:14, 200:17-21). The evidence establishes that Dr. Kunisch made this decision, eliminating one of the two Senior CQI Specialist positions on the Team, and thus selecting between Mahan Rudolph and Cull for the reduction-in-force. (Ex. 24 at ¶13). Age played no part in his decision-making process, and indeed it is illogical to suggest otherwise because, while he was unaware of their exact ages at the time, Dr. Kunisch considered Cull and Mahan-Rudolph to be close in age, and in fact they are. (Ex. 24 at ¶15). At the time of the reduction-in-force, Cull was 65 years old and Mahan-Rudolph was almost 60 years old. (Ex. 24 at ¶15).

While Cull may nevertheless believe that her lay-off must have had something to do with her age, such speculation cannot serve as evidence of discrimination under well-established Fifth Circuit precedent. *Little v. Republic Ref. Co.*, 924 F.2d 93, 96 (5th Cir. 1991) ("An age discrimination plaintiff's own good faith belief that his age motivated his employer's action is of little value."); *Gollas v. U. of Tex. Health Sci. Ctr. at Houston*, 425 F. App'x 318, 321 (5th Cir. 2011) ("The nonmovant's burden is *not* satisfied by "conclusory allegations, speculation, and unsubstantiated assertions.")*; Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 679 (S.D. Tex. 2001) (The plaintiff's "own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief.").

3.  <u>Memorial Hermann had a legitimate, non-discriminatory reason for selecting Cull for the reduction-in-force, and there is no evidence that this reason was merely a pretext for age discrimination.</u>

Even assuming *arguendo* that Cull could meet her *prima facie* burden, Memorial Hermann terminated Cull's employment for a legitimate, non-discriminatory reason:  namely, because she was selected for a reduction-in-force. The Fifth Circuit has held that a reduction-in-force categorically constitutes a legitimate, non-discriminatory reason for taking adverse employment

14

action. *E.E.O.C. v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). Cull can only survive summary judgment if she offers evidence that the "the ultimate decision makers relied on impermissible criteria when creating the reduction-in-force list." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652-53 (5th Cir. 2004).

Here, even though Memorial Hermann has no burden to prove anything in this regard, the evidence establishes that Dr. Kunisch relied upon legitimate factors in selecting Cull for the reduction-in-force instead of selecting Mahan-Rudolph:  (1) their respective 2016 performance review ratings; (2) their respective skills relative to the direction of the Team's work, which had changed since originally creating the Team; and (3) Cull's previously expressed dissatisfaction with the work of the Team and plan to search for other positions. (Ex. 24 at ¶13; Kunisch Dep. 52:17-21, 55:7-20). With respect to the first factor, it is undisputed that Cull had a lower rating than Mahan-Rudolph on their most recent, annual performance evaluation prior to the reduction-in-force. Mickan had assigned Cull a rating of "Exceeds Expectations" and Mahan-Rudolph a higher rating of "Outstanding" – the highest rating possible. (Ex. 24 at ¶13; Mickan Dep. 66:5-13; Ex. 10 [MHHS 000171-185]; Ex. 22 [MHHS 000639-644]). With respect to the second factor, Dr. Kunisch believed that Mahan-Rudolph was more integral to the Team's future mission because the Team was not doing as much of the clinician-facing work that Cull performed (and had been hired for) and more of the technical back-end work that Mahan-Rudolph performed (and had been hired for). (Ex. 24 at ¶13; Kunisch Dep. 55:7-20). Finally, with respect to the third factor, Dr. Kunisch thought that Cull would be less impacted by the decision to eliminate her decision compared to Mahan-Rudolph since Cull had already expressed dissatisfaction with the Team's work, and had been applying for other jobs. (Ex. 24 at ¶13; Kunisch Dep. 55:7-20).

Courts in the Fifth Circuit have consistently held that similar factors are legitimate, non-discriminatory reasons for selecting an employee for a reduction-in-force. *See, e.g.*, *Daniel v. Universal Ensco, Inc.*, 507 F. App'x 434, 439 (5th Cir. 2013) (holding that the defendant had a legitimate, non-discriminatory rationale for its reduction-in-force by relying on employee performance evaluations for its selection criteria); *Holloway v. ITT Educ. Services, Inc.*, No. H–13–1317, 2014 WL 4273896, at *15 (S.D. Tex. Aug. 28, 2014) (granting summary judgment in favor of the defendant in an ADEA reduction-in-force case where the plaintiff was selected for termination based upon points associated with a performance review); *Samford v. Stolle Corp.*, 181 F.3d 96, 1999 WL 346958, at *2 (5th Cir. 1999) (unpublished) (holding that the plaintiffs' assertion that they were "qualified" for their jobs was insufficient to prove that a reduction-in-force was pretext for discrimination in light of the employer's explanation that it had selected the plaintiffs for termination because it had restructured the department to emphasize skills they did not possess); *Jarvis v. Cirrus Logic, Inc.*, No. A–02–CA–652–SS, 2003 WL 22024271 (W.D. Tex. Jul. 15, 2003) (an employer's assessment of its employees' abilities is a legitimate criteria for reduction-in-force decision-making).

There is no evidence that Dr. Kunisch's reliance on these factors was actually a false pretext for age discrimination, so Cull cannot meet her burden of proof to survive summary judgment. The only evidence that Cull may offer for why she believes Dr. Kunisch based his decision on her age is that he once asked her about retirement. Specifically, when asked at deposition for the basis of her belief in this regard, Cull recalled one occasion when Dr. Kunisch approached her at her cubicle and asked:  "You can retire now, can't you?" (Cull Dep. 60:7-62:5). Cull could not recall, however, any of the circumstances surrounding this alleged interaction, including when the alleged question was asked. (Cull Dep. 60:7-62:5). Dr. Kunisch has no memory of ever asking Cull about

16

retirement, though he believes that perhaps this topic may have arisen when he was discussing his own retirement since he has made known to his Team members that he plans to retire at the age of 65. (Kunisch Dep. 56:19-57:11).

Regardless, the alleged comment in no way evidences a discriminatory intent to terminate Cull's employment, and therefore is at worst an irrelevant "stray remark." "In order for an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996) (citation omitted). Vague comments or comments remote in time to the challenged employment action are "stray remarks," insufficient to serve as proof of pretext. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996).

Dr. Kunisch's alleged question about retirement is at worst a "stray remark" because there is no evidence that it was made proximate in time to the July 7, 2017, reduction-in-force, which alone precludes Cull from relying upon it as competent evidence of discrimination. The comment is also unusable because it only vaguely references Cull's age and does not reflect a clear discriminatory animus. Indeed, courts have held that discussions of retirement do not reflect the type of discriminatory animus that would cause a reasonable jury to conclude – without any inference or presumption – that age was an impermissible factor in an employment decision. *See Hess v. Mid Hudson Valley StaffCo LLC*, No. 16-CV-1166 (KMK), 2018 WL 4168976, at *13 (S.D.N.Y. Aug. 30, 2018) (collecting cases and noting that "courts have consistently held that remarks relating to retirement . . . are insufficient to defeat a motion for summary judgment in an ADEA case"). Therefore, Dr. Kunisch's alleged stray remark cannot serve as evidence of pretext.

The only other comment Cull identified during her deposition, leading her to surmise that her age was connected with her termination, was another irrelevant "stray remark." Cull testified that a former Vice President of QPSIC, Linda Speer, heard someone mention during a meeting: "We sure have a lot of old people working here." (Cull Dep. 52:9-13, 55:2-8). Cull has no knowledge of the context of this alleged comment; she does not know when Speer told her that she heard this comment; she does not know what the purpose of the meeting was when Speer allegedly heard the comment; and she does not know who allegedly made the comment. (Cull Dep. 55:2-56:10, 57:9-58:8). As a result, this alleged comment by an unidentified person, during an unidentified meeting, without any apparent connection to the reduction-in-force that resulted in the elimination of Cull's position, cannot serve as evidence of pretext. The Fifth Circuit has made clear that comments by a superior, reflecting a discriminatory animus, may be used as circumstantial evidence of discrimination but only where such comments were made by a person who was either primarily responsible for the challenged employment action or who had influence over the decision. *See Matthews v. United Bhd. of Carpenters & Joiners of Am.*, 228 F. App'x 436, 440 (5th Cir. 2007).

For example, in *Barber v. Shaw Group, Inc.*, a pipe fitter tried to prove an ADEA claim by relying upon comments by his foreman, made prior to a reduction-in-force, that he "would be terminated soon 'because [he was] an old man and getting close to retirement age.'" 243 F. App'x 810, 811 (5th Cir. 2007). The Fifth Circuit held that summary judgment had properly been granted to the employer despite the alleged comment because "the one age-related remark by a supervisor cannot create a material fact issue on whether [the defendant's] decision was motivated by age discrimination" since the "foreman who made the remark did not have authority over the employment decision at issue...." *Id.* at 812.

Similarly here, the comment allegedly overheard by Speer cannot serve as evidence of pretext because there is no connection between this comment and Cull's termination. Indeed, Dr. Kunisch – the person responsible for selecting Cull for the reduction-in-force – denies ever hearing this comment or any similar comment from anyone. (Ex. 24 at ¶14). Therefore, just like the alleged comment that Cull attributes to Dr. Kunisch, this alleged comment by an unidentified person is a "stray remark," which is not competent evidence to prove pretext.[9]

Furthermore, Cull cannot demonstrate that the factors relied-upon by Dr. Kunisch to make the selection for the reduction-in-force was a false pretext because it is undisputed that Cull had a lower performance rating compared to Mahan-Rudolph, and because Cull admits notifying Dr. Kunisch that she was applying for other jobs, which were two of the three factors upon which Dr. Kunisch relied in making his selection. (Cull Dep. 163:20-164:4, 166:22-167:22, 189:20-190:10, 190:22-191:2). Quite simply, Cull cannot prove that the factors were false because she admits the underlying facts are true, which necessarily precludes a finding of pretext. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (noting that the plaintiff must produce "substantial evidence of pretext" and that the plaintiff must "put forward evidence rebutting *each* of the nondiscriminatory reasons the employer articulates" to establish pretext) (citations omitted) (emphasis added).

Finally, even if the Court were to find *some* quantum of evidence to support Cull's pretext argument, Memorial Hermann would still be entitled to summary judgment because Cull certainly does not have sufficient evidence to overcome the legal presumptions against discrimination which

---

[9] Even if this alleged comment were somehow probative evidence of discrimination (which it is not), Cull still could not rely upon it to defeat summary judgment because it is inadmissible hearsay within hearsay. *See* FED. R. EVID. 801, 802. It is well settled that "the admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (quoting *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995)).

exist because Dr. Kunisch and Cull are both within the age-protected class, and also because the same decision-maker (Dr. Kunisch) hired Cull for her position and then eliminated her position. "When decision makers are in the same protected class as the plaintiff, there is a presumption that unlawful discrimination is not a factor in the discharge." *See Agoh v. Hyatt Corp.*, 922, F. Supp. 2d 722, 745 (S.D. Tex. 2014). Additionally, the Fifth Circuit has held that an inference against pretext arises where the same actor is responsible for the decision to both hire and fire the employee. *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir. 1996). To overcome the inference, the employee must present "sufficiently egregious" facts to explain why an alleged discriminatory animus informed the termination decision but not the hiring decision. *See Nomani v. Star Furniture Co.*, No. 4:13-CV-03422, 2016 WL 4192057, at *11 (S.D. Tex. Aug. 8, 2016); *Penalver v. Resource Corp. of Am.*, No. 3:10–CV–0280–D, 2011 WL 1885988, at *5 (N.D. Tex. May 18, 2011).

Here, Memorial Hermann benefits from a presumption against discrimination because Dr. Kunisch and Cull are both within the age-protected class. At the time of the reduction-in-force in July 2017, Dr. Kunisch was 55 years old. (Ex. 24 at ¶15). Memorial Hermann also benefits from a presumption against discrimination because Dr. Kunisch both recruited and hired Cull for the newly created Senior CQI Specialist position in May 2015, and then terminated her employment just two years later when he eliminated her position in July 2017. (Cull Dep. 97:13-17; Ex. 24 at ¶13). There are no facts – let alone "sufficiently egregious" facts" – to show that Dr. Kunisch suddenly developed a discriminatory animus against Cull because of her age that would support a finding of pretext under those circumstances.

In summary, Cull cannot satisfy her burden of proving that she would not have been selected for the reduction-in-force but-for her age, entitling Memorial Hermann to summary judgment on Cull's ADEA discrimination claim as a matter of law.

**B.    Memorial Hermann is entitled to summary judgment on Cull's FMLA retaliation claim.**

An employee may state a "retaliation claim" where the employer retaliated against the employee for exercising her rights under § 2615(a)(2) of the FMLA. The Fifth Circuit applies the *McDonnell Douglas* framework to analyze FMLA retaliation claims. *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). To establish a *prima facie* case, the plaintiff must show that:  (1) she was protected under the FMLA; (2) she suffered an adverse employment action; and (3) either that she was treated less favorably than an employee who had not requested FMLA leave or that the adverse decision was made because she took FMLA leave. *Id.* If Cull succeeds, the burden shifts to Memorial Hermann to articulate a legitimate, non-retaliatory reason for the employment action. *Id.* Cull must then show that this reason is a pretext for retaliation. *Id.*

Cull cannot establish a *prima facie* case because there is no evidence she was treated less favorably than an employee who did not request FMLA leave. There is also no evidence of a causal connection between Cull's use of FMLA leave and Dr. Kunisch's decision to select her for the reduction-in-force. While Cull may rely on the fact that her employment terminated after she took FMLA leave, temporal proximity alone is insufficient to satisfy his burden of proof. *McCullough v. Houston County Tex.*, 297 F. App'x 282, 289 (5th Cir. 2008); *Strong v. Univ. Health Care Sys.*, 482 F.3d 802, 818 (5th Cir. 2007) ("[W]e affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation. Such a rule would unnecessarily tie the hands of employers.").

21

Moreover, even if Cull can establish her *prima facie* case, her claim fails at the pretext stage. As explained above, Dr. Kunisch relied on three factors in selecting Cull for the reduction-in-force, none of which had anything to do with her use of FMLA leave. Cull has no evidence to prove that Dr. Kunisch relied on these factors as a false pretext to terminate her employment because she took FMLA leave, any more than she has evidence to prove that the factors were a false pretext to terminate her because of her age.

When asked at deposition why she believed that her FMLA leave was connected with her termination, Cull merely responded that this was her belief. (Cull Dep. 233:14-21). As noted above, her speculative beliefs are not competent evidence to avoid summary judgment. When pressed further, Cull then testified that she believed one other person who was laid-off, named Crystal, was also on FMLA leave. (Cull Dep. 233:22-234:12). However, Cull admitted that she has no personal knowledge of whether or not Crystal was actually on FMLA leave at the time of her termination. (Cull Dep. 235:1-11).[10] Cull further admitted that Crystal was employed in a completely different position (a secretarial position in the C-suite), and that she did not know who made the decision to layoff Crystal. (Cull Dep. 234:13-14, 235:12-14). Thus, even if this evidence were admissible (which it is not), it does not prove that Dr. Kunisch's decision to eliminate Cull's position in the reduction-in-force was pretextual. Indeed, Cull admits that Dr. Kunisch had spoken with her about her need for leave when she applied in March 2017, and at no time did he ever express any dissatisfaction with her use of leave. (Cull Dep. 183:9-185:1).

Therefore, Memorial Hermann is entitled to summary judgment because Cull's FMLA retaliation claim fails as a matter of law.

---

[10] Cull admitted that her knowledge regarding the circumstances of Crystal's termination was based entirely on hearsay. (Cull Dep. 235:1-11). Consequently, Cull cannot rely upon this alleged evidence to defeat summary judgment because it is inadmissible. *See* FED. R. EVID. 801, 802; *Pegram*, 361 F.3d at 285 (noting that evidence must be admissible for purposes of summary judgment just as it must for purposes of trial).

# VI.
## CONCLUSION

For all of these reasons, Defendant Memorial Hermann Health System respectfully requests that the Court grant its Motion for Summary Judgment, that Cull take nothing, and that Defendant be awarded such other and further relief to which it is justly entitled.

Dated January 21, 2020

Respectfully submitted,

*/s/ Nehal S. Anand*

Nehal S. Anand (Attorney in Charge)
Texas Bar No. 24070600
Federal I.D. No. 1061200
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas
Telephone:  713.951.9400
Facsimile:  713.951.9212
Email:  nanand@littler.com

**ATTORNEYS FOR DEFENDANT MEMORIAL HERMANN HEALTH SYSTEM**

Of Counsel:

Luke C. MacDowall
Texas Bar No. 24104445
Federal I.D. No. 2983511
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas  77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
Email:  lmacdowall@littler.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the electronic filing system on this the 21st day of January 2020:

Mark G. Lazarz
Sidd Rao
Shellist Lazarz Slobin LLP
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
mlazarz@eeoc.net
srao@eeoc.net

*/s/ Luke C. MacDowall*

Luke C. MacDowall

4826-9102-8912.13 070168.1064

23